E-FILED on     7/6/06

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| BARBARA POLLARD,<br><br>    Plaintiff,<br><br>    v.<br><br>LIBERTY LIFE ASSURANCE COMPANY OF BOSTON AS ADMINISTRATOR AND FIDUCIARY OF THE DELL COMPUTER CORPORATION COMPREHENSIVE WELFARE BENEFITS PLAN NUMBER 501 AND THE DELL COMPUTER CORPORATION COMPREHENSIVE WELFARE BENEFITS PLAN NUMBER 501,<br><br>    Defendants. | No. C-03-02435 RMW<br><br>OPINION ON REVIEW OF ADMINISTRATOR'S DENIAL |

A hearing to review the decision by defendant Liberty Life Assurance Company of Boston ("Liberty" or "Administrator") to discontinue payment of long-term disability benefits to plaintiff Barbara Pollard ("Pollard") under Dell Computer Corporation's Long Term Disability Policy Plan ("Dell Plan") was held on July 13, 2004. The court has read the trial briefs submitted by the parties including post-hearing briefs, reviewed the evidence, and heard the arguments of counsel. The court concludes that Liberty did not abuse its discretion in making its decision to discontinue payment. Therefore, its decision is affirmed.

## I. PROCEDURAL BACKGROUND

This case involves review of the determination by Liberty, the claim Administrator, to discontinue payment, as of December 20, 2001, of long-term disability benefits to plaintiff under Dell Computer Corporation's Long Term Disability Policy Plan. The plan is governed by ERISA. A hearing was held on February 27, 2004 to determine the scope of review and whether evidence outside of the administrative record would be considered. The court, by order filed June 15, 2004, ruled that it would review the Administrator's decision based upon the record before the Administrator using an abuse of discretion standard.

## II. MEDICAL AND CLAIM HISTORY

### A.    Employment with Dell

Plaintiff Barbara Pollard was employed in the engineering department of Dell Computer Corporation/ConvergeNet ("Dell") as a software quality assurance manager. Her duties included managing the software test group, evaluating new or modified software programs, setting policies and procedures used to verify that programs functioned according to user requirements, attending meetings, and working with other groups to coordinate projects and shipments. The physical aspects of Pollard's work required lifting up to 20 pounds occasionally and up to 10 pounds frequently, using a computer, writing and prolonged sitting. CF-207; *see* CF-295-98.

Pollard did her job at Dell until January 14, 2000 at which time she requested and was authorized to take a short term leave of absence for treatment of symptoms caused by cervical stenosis.[1] BP 2133. In April 2000, Pollard requested an extended medical leave of approximately one year as recommended by Edward Hattler, M.D., her treating internist at the Kaiser Permanente Medical Group. Dell could not accommodate her request and terminated her employment. BP 2112. Plaintiff was 46 years old at the time.

### B.    Pollard's Claim for Benefits under the Dell Welfare Benefits Plan

Pollard participated in the Dell Plan. Matrix Companies was the claim administrator of

---

[1] Cervical stenosis is a condition related to the neck in which the spinal canal is too narrow for the spinal cord and nerve roots.

OPINION ON REVIEW OF ADMINISTRATOR'S DENIAL
C-03-02435 RMW

Dell's Short Term Disability Plan. Defendant Liberty, through its Dell's Group Disability Income Policy ("Policy"), provided long-term disability coverage under the Dell Plan and was the named plan Administrator for long-term disability benefits. After exhausting her short-term disability benefits, plaintiff filed a long-term disability claim with defendant Liberty on April 2, 2000. *See* BP 1700.

The Summary Plan Description of the Dell Plan provides:

> The [Long Term Disability (LTD)] Program ensures benefits equal to 60% of your base monthly earnings, up to a maximum of $10,000 a month in the event Liberty Mutual, the LTD Program insurer, determines *you have a total disability*. . . . You are initially considered totally disabled under the LTD Program if, because of illness or injury, *you are unable to perform all the material duties of your job*.

BP 1789 (emphasis added). The Policy defines "total disability" as an employee's inability to perform "all of the material and substantial duties of his occupation on an Active Employment basis because of an injury or sickness" for a ninety day elimination period and during the first thirty-six months of disability benefits. BP 1827. "Active Employment" means "on a full-time basis and paid regular earnings." BP 1826.[2]

On April 11, 2000 Liberty received plaintiff's application for long-term disability benefits. On June 2, 2000 Liberty approved the payment of those benefits. On December 20, 2001, after further review of medical records and surveillance tapes showing activities of plaintiff, Liberty discontinued payment as of December 22, 2001. Plaintiff requested review of the decision. After further review, Liberty advised Pollard on May 3, 2002 that it was not going to modify its decision to terminate payment and that the decision was final. CF-135-39.

---

[2] Plaintiff became a Dell employee after Dell acquired plaintiff's prior employer, ConvergeNet Technologies, Inc. in 1999. It is unclear whether plaintiff was covered by the ConvergeNet Plan under a grandfather provision or under the new Dell plan. For instance, an email correspondence from Cheryl Pasa, apparently of Dell, notes that plaintiff's "service date with Convergenet as well as her benefits were 'grandfathered' as a result of the acquisition." BP 2101. Under the ConvergeNet plan, total disability is defined based on an employee's own occupation for an unspecified time period, while under the Dell plan total disability is defined by an employee's own occupation for a period of thirty-six months, and then is defined based on the claimant's own occupation or "any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity." BP 2098. Plaintiff does not contend that the benefit terms of the ConvergeNet Plan apply in her case, and the trial briefs refer only to benefits under the Dell plan. Accordingly, the court treats plaintiff's claim as brought under the Dell plan.

Pollard then instituted this lawsuit.

### C. Pollard's Medical History Leading to Approval of LTD Benefits

Pollard's first difficulties with her neck or back appear to have commenced in 1979 when she had a C2-3 fusion as a result of fractures secondary to a motor vehicle accident. CF-211. Pollard's medical records do not reflect further back problems until April of 1997 when she had a four-level lumbar laminectomy (L2-S1) following an MRI showing a herniated disc at L-5 and spinal stenosis. After her surgery, she complained of increasing back pain, and a 1998 MRI revealed she was suffering from arachnoiditis.[3] She began taking pain medication and returned to work. She then began experiencing arm, shoulder and hand pain. On June 29, 1999 Pollard began seeing E. Hattler, M.D., an internist at the Kaiser Permanente Medical Group. In a Dell Certification of Health Care Provider dated January 20, 2000, Dr. Hattler reported that an "8/9 MRI shows evidence of spinal stenosis which accounts for her pain & numbness." BP 1709. He further indicated that Pollard would be incapacitated for six months or more and was "unable to preform work of any kind." BP 1710.

Dr. Hattler's opinion that Pollard was "unable to perform work of any kind" appears to have been based in large part on acceptance of Pollard's pain complaints. The Kaiser radiologist's impression of the August 9, 1999 MRI was:

> Abnormal kyphotic alignment from C3-4 to C6-7. Mild central canal stenosis is noted from C4-5 to C6-7 secondary to the disk bulges and marginal spurs. Mild mass effect on the spinal cord is noted at C4-5 and C6-7.

BP 1186.[4, 5] No nerve root impingement or injury to the spinal cord was noted. An

---

[3] Arachnoiditis describes a pain disorder caused by the inflammation of the arachnoid, one of the membranes that surround and protect the nerves of the spinal cord.

[4] The significant findings of the MRI were:

At C4-5, there is broad-based disk bulge associated with marginal spurs at the posterolateral aspects of C4. The anterior subarachnoid space is completely obliterated. Minimal mass effect is noted on the ventral surface of the spinal cord by the disk bulge. The AP dimension of the bony canal measures about 8 to 9 mm, compatible with a borderline central stenosis. Bilateral neural foramina are mildly narrowed secondary to the bony spurs.

At C5-6, the anterior subarachnoid space is mildly effaced by the disk bulge. The AP

earlier EMG examination on July 13, 1999 was entirely normal and showed no electrophysiologic evidence of left cervical radiculopathy.[6] BP 1303.  T. Kushner, D.O., in Kaiser's neurology clinic, examined Pollard on August 17, 1999 because she complained of left arm tingling and pain.  However, Dr. Kushner's neurological examination findings were normal and revealed no evidence of cervical myelopathy.[7]  CF- 596, 598.

In an Attending Physician's Statement dated April 13, 2000 Dr. Hattler expressed the view that Pollard had a class 5 physical impairment ("severe limitation of functional capacity; incapable of minimal activity") and a class 2 mental/nervous impairment ("patient is able to function in most stressful situations and engage in most interpersonal relations").  In the remarks section regarding Mental/Nervous Impairment, Dr. Hattler noted that "Patient's medications limit her ability to think clearly, reason & judge to her full capability."  CF-290, 614.  He also noted in his response to a medical update form filled out on April 13, 2000 that "[i]t has been tragic to watch her suffering and functional status decline over the past 1-2 years especially in light of the fact that there is not a definitive solution."  BP 1686.

On May 16, 2000 plaintiff's file was referred to Liberty's Managed Disability Services.  Susan Crane, R.N., noted that plaintiff had, *inter alia*, cervical spinal stenosis, depression, a

---

> dimension of the canal measures about 9 to 10 mm consistent with a borderline central stenosis. Bilateral neural foramina are patent.
>
> At C6-7, there is a broad-based disk bulge associated with bony spurs.  A mass effect is noted on the ventral surface of the spinal cord by the disk bulge and buckled longitudinal ligament.  The posterior subarachnoid space is moderately effaced by hypertrophic posterior elements.  The AP dimension of the bony canal measures about 8 mm, consistent with mild central stenosis.  Bilateral neural foramina are present.

BP 1185-86.

[5] Kyphotic means relating to or suffering from kyphosis (posterior curvature of the spine).

[6] Radiculopathy describes pain and other symptoms like numbness, tingling, and weakness in a person's arms or legs that are caused by nerves pinched as they exit the spinal canal.

[7] Cervical myelopathy is injury to the spinal cord and its function which can be caused by cervical stenosis.

OPINION ON REVIEW OF ADMINISTRATOR'S DENIAL
C-03-02435 RMW

congenitally small spinal canal, previous history of spinal surgeries and degenerative changes. Nurse Crane suggested review by a doctor to confirm Pollard's status. BP 1678.

On May 24, 2000 Dr. Nolawi Mengesha, a consulting physician for Liberty, reviewed plaintiff's file, noting that "[t]he findings of the cervical MRI are not considered dramatic or severe, and the condition would be expected to improve after some physical therapy and anti-inflammatory treatment with or without epidural injection. This condition would be expected to improve within a period of three to six weeks." BP 1660. Dr. Mengesha also noted lumbar arachnoiditis as diagnosed by a November 1998 MRI and spinal stenosis and fibromyalgia[8] as diagnosed by the treating physician at the time, Dr. Hattler. *See* CF-536.

### D. Initial Grant of Benefits under the Plan

Despite the report of its consulting physician, on June 2, 2000 Liberty's Disability Claims Manager, Katherine M. Jackson, sent a letter to plaintiff approving long-term benefits under Dell's long-term disability policy based on a determination of plaintiff's "inability to perform the duties of [her] occupation" as defined under the Dell policy. CF-0526; BP 1653.[9] Ms. Jackson's in her Analyst's Recommendation noted, "Ms. Pollard is disabled due to her cervical spinal stenosis." BP 1659.

### E. Surveillance and Further Information Leading to Termination of Benefits

Under the Policy, payment of the monthly benefits cease upon, among other events, "the date the Covered Person is no longer Disabled." BP 1354. Liberty continued its investigation of Pollard's condition after it initially approved the payment of long-term disability benefits. Records obtained include a report dated July 26, 2000 of a consultation that Dr. Hattler had requested from Kevin Booth, M.D. of Kaiser Permanente's spine clinic. Dr. Booth advised:

---

[8] Fibromyalgia is a chronic disorder characterized by widespread musculoskeletal pain, fatigue, and multiple tender points that occurs in precise, localized areas, particularly in the neck, spine, shoulders, and hips. Fibromyalgia may also cause sleep disturbances, morning stiffness, irritable bowel syndrome, anxiety, and other symptoms. Although mentioned by Dr. Mengesha, Pollard's medical records do not support a diagnosis of fibromyalgia.

[9] Plaintiff's application for Social Security Disability Benefits was approved in October 2000, retroactive to January 17, 2000. *See* BP 1622.

OPINION ON REVIEW OF ADMINISTRATOR'S DENIAL
C-03-02435 RMW

> I am not dramatically impressed by her disc bulges as a cause for her arm pain, particularly in view of the fact that at C4-5 we would expect mostly a C5 radiculopathy which would give her proximal arm pain and this is the area she says is frequently skipped by her pain. I doubt that her cervical stenosis is contributing significantly to this type of pain.

BP 1637-38. Cecil Jun, M.D. saw Pollard for a surgical consultation on March 9, 2000. In his report he discussed her prior history and her continuing cervical and lumbar pain. Dr. Jun concluded that even with surgery she would continue to have pain and that "Pollard is one of those unfortunate patients who do have the prospect of chronic pain and . . . that the pain is severe enough to be disabling." CF-224. Dr. Hattler documented in an August 23, 2000 Restrictions Form Pollard's chronic pain problem and diagnosed it as caused by cervical spinal stenosis. BP 1632. A rheumatology consultation requested by Dr. Hattler from David Campen, M.D. stated that a normal physical exam was performed on October 6, 2000 and revealed "[n]o evidence of any active alternative source of [Pollard's] chronic problems." BP 1183. His physical examination of Pollard "revealed full range of motion of the joints, normal pulses, normal color, no skin abnormalities, normal sensation, good finger spread, wrist extension, and thumb apposition." *Id.* A report from Stephen Fisk, M.D., PhD., a physician in Kaiser's Department of Pain Service, stated that a February 20, 2001 MRI of Pollard showed continued progression of degenerative disk disease with narrowing at C4-C5, C5-6 and C6-7 and that osteophytes[10] which were noted in a previous MRI had continued to grow. CF-222-23, 289; BP 1584-85. "The above findings explain her ongoing increased weakness, numbness and tingling in her upper extremities." *Id.* He also noted that she suffered from post-operative arachnoiditis which has caused significant disability and pain in her lower extremity. *Id.* Dr. Fisk concluded that Pollard was "presently disabled for her previous employment." BP 1585.

Plaintiff filled out a Liberty Claimant Information Form on January 1, 2001 in which she stated that she was able to perform the activities of daily living and did not use any assist device. She also reported that she could go on small trips, do laundry and drive or ride in a car for 30 to 45 minutes, and read regularly. She was able to leave the house seven to ten times a week. After

---

[10] Osteophytes is the medical term for bone spurs. Osteophytes represent an enlargement of the normal bony structure and are a radiographic marker of spinal degeneration.

stating she could do the foregoing activities, she concluded the Activities Questionnaire section of the Claimant Information Form by describing her daily routine:

> I get up out of bed and sit in my recliner for about 1 ½ hours until my meds work and stiffness is out of my body. I shower and dress. I run errands (small things). I read and walk. I take my dog to the park so she can run. I shop when I'm able and fix dinner on good days, which is about 3 times a week. When I have bad spells, or flare-ups, they can last for 2-3 weeks and during that time, I'm very helpless and my activity level is nil. I have no control over my body.

BP 1609-12.

On March 11, 2001 Liberty hired MJM Investigations to perform surveillance on plaintiff which took place from March 29 to March 31, 2001. Plaintiff was moving from San Jose to Rocklin, California during this time, and was observed bending at the waist and carrying objects in her hand, walking around, reaching, sweeping off a tarp, twisting a broom handle and sweeping at shoulder height level.

Liberty requested an updated Activities Questionnaire from plaintiff on July 13, 2001. Plaintiff responded that she was able to sit 10-15 minutes, stand 10 minutes, and walk 20 minutes, to be alternated during the day. She left the house 3-4 times during the week, went to the mall 1-2 times a month, went outside daily, and also took weekend trips in the family motor home. *See* BP 1554-56. Dr. Janet Eatherton, an internist who replaced Dr. Hattler as plaintiff's primary treating physician, provided plaintiff's medical files on September 10, 2001.

On September 24, 2001 Liberty referred plaintiff's file to its Managed Disability Services unit for review and recommendations. Christine Entrekin, R.N., noted that previous providers agreed that plaintiff "cannot return to work due to problems associated w/upper extremity symptoms as well as limitation in sitting/standing as it relates to ongoing back [and] lower extremity symptoms." CF-344. She also noted "some indication of previous behavioral counseling in [the] past," but she had no actual notes to review. *Id.* Nurse Entrekin also noted that "[a]pparently a limited psychological evaluation did not reveal any significant maladjustment." *Id.* Entrekin concluded that:

> Cervical MRI findings are abnormal however the severity of the subjectively reported symptoms does not seem to correlate with the diagnostic findings. Lumbar symptoms confirmed secondary to arachnoiditis. Pain being a subjective symptom is therefore being treated as it is being perceived.

1 *Id.* Entrekin then recommended review of Pollard's records by Gale Brown, Jr., M.D., who was
2 Board Certified in Physical Medicine and Rehabilitation and a consulting physician for Liberty.

3 On October 4, 2001 Liberty sent a letter to Dr. Brad Kuper, Ph.D., requesting a copy of
4 plaintiff's psychological assessment (CF-340) and a letter to Dr. Eatherton requesting completion of
5 a Physical Capacities Form. CF-330. Dr. Ruper's psychological assessment found "no clinically
6 significant indications of psychological maladjustment at this time." CF-331. Liberty received a
7 completed Physical Capacities Form from Dr. Eatherton on November 1, 2001 which noted that
8 plaintiff could walk, sit, stand, squat, bend, kneel, climb stairs and ladders, drive, push and pull,
9 reach, grasp, and use her fingers less than one hour per day. CF-323. She could not work 8 hours
10 per day, and she could not lift any weight due to chronic back pain. *Id.*

11 Further surveillance of plaintiff was performed by MJM Investigations on October 11 and
12 12, 2001, and again on October 23, 25 and 27, 2001. Plaintiff was observed driving, carrying
13 groceries, entering and exiting her car, bending, kneeling and reaching. Plaintiff was also observed
14 at camping grounds with her motor home, walking, throwing and kicking a ball, and picking up
15 objects from the ground.

16 **F.    Liberty's Decision to Terminate Benefits**
17      **1.    Medical findings**

18 Dr. Brown reviewed plaintiff's file and prepared a detailed report dated November 1, 2001.
19 CF-284-291. Dr. Brown did not personally examine plaintiff. Dr. Brown found that there was
20 medical evidence substantiating, *inter alia*, lumbar arachnoiditis and mild cervical stenosis with
21 multilevel degenerative disk disease. *See* CF-284. However, Dr. Brown found "no objective basis
22 for associated musculoskeletal or neurological impairment associated with these diagnostic
23 conditions." *Id.*

24 On December 20, 2001 Liberty advised Pollard that she did not meet the requirements for
25 long-term disability payments and discontinued benefits as of December 22, 2001.

26      **2.    Basis of Dr. Brown's Conclusions**

27 Dr. Brown's report notes that she reviewed plaintiff's available medical records through
28 September 7, 2001 for her November 1, 2001 report including records of examinations of plaintiff

OPINION ON REVIEW OF ADMINISTRATOR'S DENIAL
C-03-02435 RMW

9

1  conducted prior to the initial approval of disability benefits on June 2, 2000. CF-287-289. While a
2  radiology report revealed some mild central canal stenosis secondary to disk bulges and marginal
3  spurs, as well as some mild mass effect on the spinal cord, there was no evidence for concomitant
4  cervical radiculopathy or myelopathy. *Id.*[11] She also noted Pollard suffered from arachnoiditis in
5  the lower back but there was no evidence of radiculopathy or myelopathy emanating from a lumbar
6  spine condition. Findings of disabling pain were based primarily on plaintiff's personal statements.
7  *Id.* Dr. Brown noted that objective neurological exams performed on plaintiff by Dr. Kushner on
8  August 17, 1999 with a follow up on September 28, 1999 were normal. *Id.* Dr. Brown noted that
9  Dr. Booth of the spine clinic saw Pollard for a surgical evaluation on July 26, 2000, found no
10 evidence of typical radiculopathy, noted that "[s]trength testing revealed 'giving way and some effort
11 dependent weakness'" and recommended against surgery. *Id.* at CF-288. Although not specifically
12 noted in Dr. Brown's report, Dr. Booth also stated he was "not dramatically impressed by her disk
13 bulges as a cause for her arm pain" particularly in light of the inconsistency between the area of
14 stenosis and the location of the reported pain. BP1637. Dr. Brown also found significant that Dr.
15 Campen, a rheumatologist, noted that Pollard had full range of motion in all joints.

16  Based on video surveillance and what Dr. Brown found was a lack of objective evidence
17 supporting plaintiff's complaints of pain, Dr. Brown concluded that plaintiff could perform light duty
18 work, including the essential duties of her own occupation full time, with certain physical
19 restrictions. *See* CF-285.[12] Dr. Brown recommended the following physical restrictions: (1) no
20 lifting of more than 25 pounds on a frequent to constant basis; (2) position changes as necessary for
21 comfort; (3) no frequent or constant bending or twisting at waist level; and (4) no sustained
22 overhead work. *Id.* Dr. Brown indicated that she attempted to contact plaintiff's physician on
23 November 2, 2001, but noted that plaintiff's physician was not available to discuss the case. CF-

---

[11]  Dr. Brown's report referred to this MRI as dated May 12, 1999, but it appears that the described MRI is the August 12, 1999 MRI report from Dr. Sunhee Lee. *See* BP 1185-86.

[12]  Dr. Brown also found no evidence of mental clouding. CF-285.

OPINION ON REVIEW OF ADMINISTRATOR'S DENIAL
C-03-02435 RMW

291.  Dr. Brown concluded "I do not recommend IME [independent medical examination] or FCE [functional capacity evaluation][13] at this time."  CF-286.

On November 19, 2001 Liberty sent letters and a copy of Dr. Brown's report to Dr. Kuper and Dr. Eatherton, plaintiff's treating physicians at the time, requesting comments about the report and Dr. Brown's conclusion that plaintiff could perform her own occupation on a full time basis.  *See* CF-282-83.  Also on November 19, 2001 Liberty referred plaintiff's file to MPO Consulting for a vocational case management assessment.  MPO Consulting concluded in a report on December 19, 2001 that plaintiff had several vocational alternatives, and could return to her previous occupation full time.  *See* CF-252-55.

Liberty discontinued long-term disability benefits by letter dated December 20, 2001. CF-242-45.  "Non medical information obtained by Liberty Mutual during the course of our claim review includes verification that on several occasions, it is documented that your observed daily activities contradict the restrictions and limitations provided by your treating doctors, and those self reported by you." CF-243.  Further, "[i]t has been determined that there is no objective basis for your subjective complaints of pain, and that you are capable of light physical work capacity," subject to certain restrictions.  CF-244.

**G.     Pollard's Appeal and Liberty's Affirmance of its Denial**

Dr. Eatherton sent a letter to Liberty dated January 26, 2002 wherein she commented on Dr. Brown's review of Pollard's case:

> . . . I am writing to comment on the claims made by the reviewing doctor. The diagnoses appear correct, although I do not have access to her entire medical record.
>
> Significant objective findings do include arachnoiditis on MRI, cervical stenosis with neuroforaminal narrowing on multiple levels on MRI. A recent (2/19/02) MRI of the cervical spine confirms this to be an ongoing finding . . . . The degree of pain, radiculopathy and therefore limitations of activity from arachnoidits and cervical spinal stenosis are difficult if not impossible to quantify.  Review of her records available to me, and conversations with Drs. Fenton, and Hattler have revealed a difference of opinion. Dr. Fisk and Hattler feel that her pain and radicular symptoms are clearly from

---

[13]     A task-specific functional capacity evaluation is a structured process of observing and measuring an individual performing tasks in order to identify performance deficits and safety issues, functional abilities, strengths, skills and capacity to perform specific work-related tasks.

> the known spinal processes. Their feeling is that her symptoms are debilitating, chronic and severe. Drs. Booth and Fenton do not feel that the degree of spinal stenosis and neuroforaminal narrowing is consistent with her level of pain and radiculopathy. Dr. Fenton felt, though that the arachnoiditis is a very painful, debilitating, progressive process, warranting disability on its own.
>
> Ms. Pollard has been taken off narcotics at her request. Clouding of sensorium secondary to pain medication is no longer at issue.
>
> Ms. Pollard will certainly have physical limitations. The limitations reported by me in my last status report are those reported to me by the patient. It is difficult to generalize about physical limitations based on specific spine elements, especially in a patient with multiple chronic conditions.
>
> It is equally difficult to extrapolate realistic workplace physical capacity from the activities of daily living noted of video surveillance. Pain level and recovery time from activity cannot be assessed from the snippets of her life that were surreptitiously observed. While Ms. Pollard was observed sitting and standing/ walking for longer periods of time, I did not notice that she bent at the waist or lifted overhead for a significant period of time. She was also not observed lifting anything that appeared to be more than 5-10 lbs.
>
> Ms. Pollard's case is a complicated case . . . .

CF-209.

On February 19, 2002 L. Neena Madireddi, M.D., a Diplomate of the American Board of Physical Medicine and Rehabilitation, evaluated Pollard at her request for the purpose of providing a report to Liberty regarding Pollard's ability to return to work at Dell as a software quality assurance manager. CF210-214. Dr. Madireddi concluded that Pollard had both cervical and lumbar disc disease which is unlikely to improve and will likely progress with time. Dr. Madireddi also opined that Pollard "is unable to perform all of the material and substantial duties of her occupation based upon her disabling cervical and lumbar spinal conditions." CF-214.

On March 19, 2002 Dr. Hattler wrote Liberty disagreeing with Dr. Brown's opinion that there was no evidence of cervical radiculopathy. Dr. Hattler submitted that Pollard's symptoms were consistent with cervical radiculopathy and that she was not capable of doing her job. "It is my opinion that Ms. Pollard continues to have chronic pain related to her cervical stenosis, and to a lesser extent her lumbar aracahnoiditis." CF-216-17.

Dr. Fisk wrote Liberty on May 4, 2001 stating that he felt that Pollard could not work in her previous line of work, and he explained why. CF-222. He described that Pollard had both lumbar and cervical pain resulting from degenerative disc disease. *Id.* He pointed out that she had had a

OPINION ON REVIEW OF ADMINISTRATOR'S DENIAL
C-03-02435 RMW

1  lumbar laminectomy complicated by post-operative arachnoiditis and that this condition would not
2  resolve and will cause chronic pain. *Id.* In addition, he explained that she has degenerative disc
3  disease in her cervical spine with significant degenerative joint disease and resultant pain down both
4  arms. Her most recent MRI showed diffuse cervical spondylosis involving at least three levels,
5  which coupled with disc protrusions, gave her significant narrowing of the foramina in her neck out
6  of which sensory nerves issue. *Id.* This caused ongoing radicular pains in her arm. *Id.*

7  Dr. Brown's opinion was not changed by the additional reports, and Liberty denied
8  reconsideration on May 3, 2002.

## III.  REVIEW OF ADMINISTRATOR'S DETERMINATION

### A.  Review Is Limited to Record Before Administrator

11  In its order of June 15, 2004 this court determined that Liberty's denial of benefits was
12  subject to an abuse of discretion standard of review. The parties dispute whether new matter, here
13  plaintiff's October 11, 2002 surgery and Dr. Eatherton's March 21, 2003 letter, may be considered
14  even though they were not before the Administrator at the time of the denial of benefits. Since the
15  standard of review in the instant case is whether there was an abuse of discretion, the court's review
16  is limited to the record before the Administrator at the time of the denial of benefits. *See Jebian v.*
17  *Hewlett-Packard Co. Employee Benefits Org. Income*, 349 F.3d 1098, 1110 (9th Cir. 2003);
18  *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 944 (1999) (citing *Taft v. Equitable Life Assur. Soc.*, 9
19  F.3d 1469, 1471 (9th Cir. 1993)). Accordingly, Liberty's objections to evidence which was not
20  before the Administrator are sustained.

### B.  Abuse of Discretion Standard for Review of Administrative Record

22  "The abuse of discretion standard 'does not permit overturning a decision where there is
23  substantial evidence to support the decision, that is, where there is relevant evidence [that]
24  reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two
25  inconsistent conclusions from the evidence.'" *Butler v. Shoemake*, 173 F. Supp. 2d 1069, 1076 (D.
26  Or. 2001) (quoting *Snow v. Standard Ins. Co.*, 87 F.3d 327, 332 (9th Cir. 1996) (overruled on

other grounds).[14]  Although an ERISA administrator is entitled to substantial deference, that administrator "must have some reasonable basis for its decision denying benefits." *Zavora v. Paul Revere Life Ins. Co.*, 145 F.3d 1118, 1123 (9th Cir. 1988).  For instance, "[i]t is an abuse of discretion for an ERISA plan administrator to make a decision without any explanation, or in a way that conflicts with the plain language of the plan, or that is based on clearly erroneous findings of fact." *Jones v. Aetna U.S. Healthcare*, 136 F. Supp. 2d 1122, 1133 (C.D. Cal. 2001) (citing *Taft v. Equitable Life Assur. Soc.*, 9 F.3d 1469, 1472-73 (9th Cir. 1993)); *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) (ERISA administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including opinions of a treating physician"); *Zavora*, 145 F.3d at 1123 ("Although [the plan administrator] acknowledged the reports of Dr. Fett, they rejected their conclusions without a sufficient evidentiary basis for doing so.").

In the present case Liberty gave a detailed explanation for its decision and did not make a decision that conflicted with the plain language of the plan.  That leaves the question of whether Liberty made clearly erroneous findings of fact.  Pollard claims the Administrator: (1) did not credit the opinions of Pollard's treating physicians and other doctors who actually examined plaintiff and concluded that she was unable to perform the duties of her job; (2) gave no weight to plaintiff's statements that she was in constant pain; (3) changed its initial determination that plaintiff was entitled to long-term disability benefits without a change in plaintiff's condition; and (4) never had plaintiff examined.

**C. Analysis of Pollard's Claims of Abuse of Discretion**

**1. Consideration of Opinions of Treating and Examining Physicians**

Dr. Brown acknowledged that medical evidence substantiated the diagnoses of treating physicians Drs. Hattler and Fisk that Pollard suffered from cervical stenosis and lumbar arachnoiditis with multilevel degenerative disk disease.  Dr. Brown also agreed that certain physical activity restrictions were appropriate.  However, she disagreed with the conclusion that Pollard

---

[14]  The Ninth Circuit overruled *Snow's* holding that language requiring claimants to submit "satisfactory written proof" of their claims confers discretion on the plan administrator and triggers "abuse of discretion" review.  *See Butler*, 173 F. Supp. 2d at 1076 n.7 (citing *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1089-90 (9th Cir. 1999)).

suffered disabling pain. She found no objective basis for associated musculoskeletal and neurological impairment related to Pollard's back condition and believed the surveillance tapes showed Pollard performing activities which were not consistent with her alleged pain.

ERISA does not require plan administrators to accord special deference to opinions of treating physicians. *Nord*, 538 U.S. at 830-833. Nevertheless, administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including opinions of a treating physician." *Id.* at 834. In this case, Liberty found Pollard not to be totally disabled despite the opinions of Pollard's treating physicians. The question for the court on review is not whether it agrees with Liberty's decision but rather whether "there is relevant evidence that reasonable minds might accept as adequate to support [Liberty's decision]." *See Butler,* 173 F. Supp. 2d at 1069. In *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, the court explained

> When we review for abuse of discretion, it is because the plan has put the locus for decision in the plan administrator, not in the courts, so we cannot substitute our judgment for the administrator's. We can set aside the administrator's discretionary determination only when it is arbitrary and capricious. We have held that a decision grounded on *any* reasonable basis is not arbitrary or capricious, and that in order to be subject to reversal, an administrator's factual findings that a claimant is not totally disabled must be clearly erroneous.

370 F.3d 869, 874 (9th Cir. 2004).

### 2. Liberty's Decision to Stop the Payment of Benefits Was Reasonable and Not Arbitrary and Capricious

One could reasonably conclude that Pollard was disabled at the time Liberty terminated the payment of benefits. Such a conclusion would be supported by the opinions of several doctors including Pollard's former internist Dr. Hattler, Dr. Booth from Kaiser's Pain Clinic, Dr. Madireddi, a physical medicine and rehabilitation physician hired by Pollard to provide a report to Liberty, and, to some extent, Dr. Eatherton, Pollard's current internist. However, these opinions supporting Pollard's claimed disability do not necessarily make Liberty's decision concluding otherwise clearly erroneous.

The primary issue in this case is the extent of Pollard's pain and resulting physical limitations. The record establishes that the extent of Pollard's pain is difficult to evaluate and thus

OPINION ON REVIEW OF ADMINISTRATOR'S DENIAL
C-03-02435 RMW

1    her physical limitations are similarly difficult to judge. As noted by Dr. Eatherton,[15] in her letter of
2    January 2, 2002, "Ms. Pollard's case is a complicated case . . . ." and there is a difference of opinion
3    between doctors who had seen Pollard. CF-209. Although Dr. Eatherton basically supports
4    Pollard's claim of disability, she acknowledged that Dr. Brown's diagnoses appeared correct. Dr.
5    Eatherton also noted that her own opinions were based upon what Pollard reported to her about her
6    problems.

7    Liberty's decision to terminate benefits was based primarily upon Dr. Brown's review of
8    Pollard's medical records and the surveillance tapes. Although Pollard's treating physicians support
9    her disability, many of the consulting physicians to whom Pollard was referred found little to
10   explain her reportedly totally disabling symptoms (Drs. Campen, Booth, Kushner and Mengesha).
11   In addition, despite radiographic findings that showed mild cervical stenosis and lumbar
12   arachnoiditis, there was no objective evidence of musculoskeletal or neurological impairment
13   associated with these conditions. The treating physicians' opinions appear to depend to a large
14   degree on accepting Pollard's reports of pain and resulting limitations.

15   The video surveillance tapes of Pollard's activities may have been taken, by coincidence, on
16   Pollard's better days, although they were taken over two several day periods. Even if they were by
17   happenstance taken on Pollard's better days, they nevertheless do suggest that Pollard may have
18   overstated the extent of her difficulties. They do show her performing some activities that seem
19   inconsistent (e.g. sweeping at shoulder level, driving and loading a camper and sitting for a long
20   period) with being totally disabled. It also seems unlikely that she, if truly totally disabled, could
21   handle sitting in a camper for weekend trips that she apparently took with her husband. It also
22   appears that if she could do the activities reflected on the tapes, she could perform the requirements
23   of her job.

24   The court cannot find that Liberty's conclusion that Pollard was not totally disabled clearly
25   erroneous or that Liberty abused its discretion in terminating Pollard's long term benefits.

---

[15] Apparently, Ms. Pollard was not satisfied with Dr. Hattler, who was replaced by Dr. Eatherton.

### 3. Weight Given to Pollard's Statements That She Was in Constant Pain

Plaintiff complains that Liberty gave no weight to Pollard's complaint that she was in constant pain. The record does not suggest that Liberty disputed that Pollard had cervical stenosis and lumbar arachnoiditis, that she suffered some pain or that she should restrict her activities in certain respects. What Liberty disputed was that her condition was so severe that she could not do her job. Liberty's review was for the purpose of evaluating her claim of disabling pain and there is no evidence that liberty totally ignored her subjective complaints.

### 4. Liberty's Change of Position Was Not an Abuse of Discretion

Pollard complains that Liberty changed its initial determination that she was entitled to long-term benefits without a change in her condition. Payment of the monthly benefits under the Policy ceases upon, among other events, "the date the Covered Person is no longer Disabled." BP 1354. Implicit in that provision is that Liberty can change its determination if it learns information showing that its initial determination was wrong. A contrary policy would discourage Plans from making early decisions. Encouraging plans to make early decisions generally is in the best interest of plan beneficiaries.

### 5. Effect of Liberty's Decision Not to Have Plaintiff Examined

Pollard complains that Liberty abused its discretion, in part, by denying benefits without having her examined by a physician of its own choosing. Nothing in the Plan requires such an examination. In this case, Pollard had been examined by a plethora of doctors and had numerous medical records including radiographic reports on which to base a determination. There was no abuse in failing to have Pollard examined by a consulting physician.

### 6. Effect of Pollard's Mental Health on Her Ability to Work

Dr. Hattler mentioned that Pollard suffered from "mental clouding" as a result of medications she took. However, as Dr. Brown observed, she had been on these medications for years and able to perform her essential job duties. In addition, a psychological assessment found no evidence of

OPINION ON REVIEW OF ADMINISTRATOR'S DENIAL
C-03-02435 RMW
17

psychological maladjustment.[16]  Finally, Dr, Eatherton reported that Pollard was taken off her narcotic prescriptions in January 2002.[17]

### IV.  ORDER

Although reasonable minds could reach different conclusions as to whether Pollard was totally disabled at the time Liberty terminated benefits, the court cannot substitute its judgment for Liberty's or find that Liberty's determination was arbitrary and capricious.  Since Liberty's decision was not clearly erroneous, its decision to terminate benefits is affirmed.

DATED:     7/6/06

*Ronald M Whyte*
RONALD M. WHYTE
United States District Judge

---

[16]   Some negative work-related issues arose between Pollard and her employer shortly before Pollard stopped working.  There, however, is no meaningful evidence that stress over this situation significantly contributed to her alleged inability to work.

[17]   It appears Pollard may have subsequently resumed her narcotic medications.

OPINION ON REVIEW OF ADMINISTRATOR'S DENIAL
C-03-02435 RMW

18

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiff:**

Scott D. Kalkin				robokalk@earthlink.net

**Counsel for Defendants:**

Pamela E. Cogan				pcogan@ropers.com

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:**	7/6/06				/s/ JH
							**Chambers of Judge Whyte**

OPINION ON REVIEW OF ADMINISTRATOR'S DENIAL
C-03-02435 RMW